IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| Commodity Futures Trading Commission, Plaintiff, | |
| vs. | Civil Action No: 05-CV-900 |
| MARIN ILLIEV YANEV, individually and d/b/a FX UNIGMA, INC. and FX WORLD, INC. Defendant. | Judge Watson/Magistrate Judge King |

## CONSENT ORDER OF PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF AGAINST DEFENDANT

Defendant Marin Illiev Yanev ("Defendant") and Plaintiff Commodity Futures Trading Commission ("the Commission") (collectively referred to herein as "Parties"), hereby agree to entry of this Consent Order of Permanent Injunction and Other Equitable Relief Against Defendant ("Consent Order") as follows:

### I. INTRODUCTION

On September 29, 2005 the Commission filed a complaint against Defendant, individually and doing business as FX Unigma, Inc. and FX World, Inc., alleging fraud and violations of the Commodity Exchange Act ("Act"). In addition, the Commission filed a motion for an *ex parte* statutory restraining order under Section 6c of the Act. The Complaint sought injunctive relief, monetary damages and civil monetary penalties, alleging in Count One that Defendant violated Section 4b(a)(2) of the Act, 7 U.S.C. § 6b(a)(2) (2002), and Commission Regulation 1.1(b) (1) and (3), 17 C.F.R § 1.1(b)(1) and (3) (2005) by cheating or defrauding or

*M-I.Y.*

attempting to cheat or defraud other persons and willfully deceiving or attempting to deceive other persons.

The Court issued a statutory restraining order on September 29, 2005 freezing Defendant's assets and preserving records. On December 8, 2005 the Parties agreed to a Preliminary Injunction, which the Court signed on December 12, 2005.

The Defendant answered the Complaint, denying liability and asserting various affirmative defenses.

## II. CONSENTS AND AGREEMENTS

To effect settlement of the matters alleged in the Complaint without a trial on the merits, Defendant, hereby:

1. Consents to the entry of this *Consent Order of Permanent Injunction and Other Equitable Relief Against Defendant* ("Consent Order").

2. Affirms that he has read and agreed to this Consent Order voluntarily and that no threat, or promise other than as set forth specifically herein, has been made by the Commission or any member, officer, agent or representative thereof, or by any other person, to induce consent to this Consent Order,

3. Acknowledges service of the Summons and Complaint.

4. Admits that this Court has jurisdiction over him and the subject matter of this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2002).

5. Admits that venue properly lies with this Court pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2002).

6. Waives:

2

*M.I.Y.*

    a.  All claims that he may possess under the Equal Access to Justice Act, 5 U.S.C. § 504 (2002) and 28 U.S.C. § 2412 (2002);

    b.  Any claim of Double Jeopardy based upon the institution of this proceeding or the entry in this proceeding of any order imposing a civil monetary penalty or any relief; and

    c.  All rights of appeal from this Consent Order.

  7.  Consents to the continued jurisdiction of this Court for the purpose of enforcing the terms and conditions of this Consent Order and for any other purposes relevant to this case;

  8.  By consenting to the entry of this Consent Order, Defendant neither admits nor denies the allegations of the Complaint or the Findings of Fact or Conclusions of Law contained in this Consent Order, except as to jurisdiction and venue, which he admits. Defendant agrees that neither he nor any of his agents or employees under his authority or control shall take any action or make any public statement denying, directly or indirectly, any allegation in the Complaint or any Findings of Fact or Conclusions of Law in the Consent Order, or creating, or tending to create, the impression that the Complaint or this Consent Order is without a factual basis; provided, however, that nothing in this provision shall affect Defendant's (a) testimonial obligations; or (b) right to take legal positions in other proceedings to which the Commission is not a party. Defendant shall take all necessary steps to ensure that all of his agents and employees understand and comply with this agreement;

  9.  Solely with respect to any bankruptcy proceeding relating to Defendant or any proceeding to enforce this Consent Order, Defendant agrees that the allegations of the Complaint and the Findings of Fact made by this Court and contained in Part II of this Consent Order shall be taken as true and correct and be given preclusive effect, without further proof, or for any other

3

*M.I.Y.*

proceeding relating to the fitness of the Defendant to act in various capacities governed by the Act. Defendant shall provide immediate notice of any bankruptcy filed by, on behalf of, or against him in the manner required by Part IV of this Consent Order. No provision of this Consent Order shall in any way limit or impair the ability of any person to seek any legal or equitable remedy against Defendant or any other person in any other proceeding.

### III.  FINDINGS OF FACT AND CONCLUSIONS OF LAW

10. The Court, being fully advised in the premises, finds that there is good cause for the entry of this Consent Order and that there is no just reason for delay. The Court therefore directs the entry of findings of fact, conclusions of law, and a permanent injunction and ancillary equitable relief pursuant to § 6c of the Act, 7 U.S.C. § 13a-1 (2002), as set forth herein.

#### A.  **Findings of Fact**

#### 1.  **Parties**

11. Plaintiff Commodity Futures Trading Commission is an independent federal regulatory agency charged with the responsibility for administering and enforcing the provisions of the Act and Regulations promulgated thereunder.

12. Defendant Marin Illiev Yanev, an individual, currently resides in Sofia, Bulgaria. He has never been registered with the Commission in any capacity.

#### 2.  **Fraudulent Solicitation of Customers**

13. Defendant used a Visa credit card to pay for the registrations of the website domain names *www.fx-world.com* in August 2003 and, in October 2003, used the same credit card to register the website domain name *www.fx.unigma.com* (collectively, the "FX Unigma websites"). The FX World website either directed users to the FX Unigma website or under FX World solicited customers for FX Unigma using the exact same information found on the FX

4

*M. I. Y.*

Unigma site and directing payment to Defendant in Bulgaria. E-mails to the FX World site were answered by FX Unigma. FX Unigma, Inc and FX World were not incorporated or registered to do business anywhere in the United States. Since approximately December 2003 thru December 2005, Defendant used the FX Unigma websites, among other things, to solicit individuals to become managed forex account customers of FX Unigma.

a. Fraudulent "Guarantees" of Profits as High as 200% per Annum

14. Starting in December 2003, Defendant, through the FX Unigma websites, offered managed forex account services by fraudulently guaranteeing profits, in some instances as high as 200% per annum. The material misrepresentations made by Defendant include:

a) *"Managed Forex Accounts allow clients to earn often well in excess of 100% per annum profits or more per year. This is a GUARANTEED option for amounts up to US $5,000.";*

b) *"Accounts opened with US $500 up to US $5,000 – 6 months fixed: Net profits of 100% in 6 months. Profits can be withdrawn after 6 months, principal must stay on deposit for 12 months";*

c) *"Accounts opened with US $1,000 up to US $ 5,000 – monthly interest payments of 20%: Interest paid monthly after end of first new calendar months (sic) (5 months effective). Profits can be withdrawn within 5 months. Principal must stay on deposit for 12 months";* and

d) *"Accounts opened with US $500 up to US $ 5,000 – account renewal on next 6 months; Net profits of 200% in 12 months...."*

5

M. I. Y.

### b. Misrepresentations Concerning of FX Unigma's Business Operations

15. From approximately February 2004 through September 2004, Defendant falsely represented to prospective customers, via the FX Unigma websites, that FX Unigma, "an international company," maintained offices in Zurich, London and Great Neck, New York. The FX Unigma website included photographs of FX Unigma's purported office buildings in all three locations. The Great Neck address, however, is a residence, not an office building, and has no affiliation with FX Unigma or Defendant.

16. According to the United Kingdom's Financial Services Authority ("FSA"), the London address shown on the FX Unigma websites was also a residence, not a commercial business address, and had no affiliation with FX Unigma. Further, the FSA had no record of FX Unigma or Defendant ever being authorized to conduct a forex business in the United Kingdom. The claim of offices in London and New York was intended to materially mislead potential customers regarding the extent and legitimacy of FX Unigma's business operations.

### c. Other Fraudulent Solicitations Concerning Managed Forex Accounts

17. Defendant's Internet websites solicited customers using material misrepresentations concerning FX Unigma's managed forex accounts. Specifically, Defendant, through the FX Unigma websites, stated that customers could trade forex through supposedly profitable managed accounts, using materially misleading risk disclosure statements. In addition, Defendant removed references to FX Unigma's fictitious Great Neck, New York office, and instructed potential customers seeking to trade through the managed account program to send account opening documents to an address and facsimile number in New Jersey.

18. In the websites' section entitled "Managed Accounts," the Defendant defrauded or attempted to defraud prospective customers by stating that FX Unigma's managed forex

6

*M. I. V.*

account program, consisting of the "FX Unigma MAC" and the "FX Unigma MAC Aggressive," was "established in October 2000."[1] In fact, the FX Unigma webpage is identical to a webpage operated by Gain Capital, a registered Futures Commission Merchant, with the exception that "Gain Capital" is replaced by "FX Unigma." The FX Unigma websites described the "FX Unigma MAC" managed forex account as one that: "Utilizes discretionary and technical trading disciplines combined with moderate leverage (typically between 1:1 and 5:1) to minimize return volatility." Although the websites described the "FX Unigma MAC" managed forex account as "[i]deal for those seeking a moderate risk, lower return investment strategy," Defendant provided a chart to potential customers which describes profits since inception of "98.06%." Once again, Defendant copied this language and the webpage layout from Gain Capital, with the exception that the claimed profit percentage was increased.

    19.    The "FX Unigma MAC Aggressive" managed forex account is described by FX Unigma as follows:

> *Based on the success of FX Unigma MAC, FX Unigma Aggressive launched in June, 2003 as a higher risk/higher reward alternative for investors seeking capital appreciation. FX Unigma MAC Aggressive appropriates higher leverage (typically between 1:1 and 10:1) and advanced short-term trading practices to capitalize on both market volatility and fundamental-based trends.*

Taken directly from the Gain Capital webpage, the FX Unigma website provided potential customers with a chart claiming profits since inception of "25.36%." Since January 2005, Defendant's purported profit chart on the FX Unigma websites described profits in the managed forex accounts for "1YR," "2YR," and "YTD" as "22.45%," "25.36%," and "20.59," respectively. These claims were false and had no basis in fact. Defendant knew these claims were false because he knew the managed account program did not exist and that the profit

---

[1] Defendant's websites made various contradictory and misleading claims that FX Unigma's purported managed forex funds were established in 1995, or October 2000, or June 2002.

7

*M.I.Y.*

returns were simply fabricated. This is because, despite the Defendant's fraudulent solicitations to prospective customers to invest in the managed accounts program, Defendant never received any funds for this purpose.

### B. Conclusions of Law

#### 1. Defendant Violated Section 4b(a)(2)(i) and (iii) of the Act and Section 1.1(b)(1) and (3) of the Regulations by His Fraudulent Solicitations and Omissions.

20. The Commission has established a violation of its antifraud provisions because it has demonstrated: (1) a misrepresentation on the part of the Defendant; (2) that the misrepresentation has been made with scienter; and (3) that the misrepresentation is material. *CFTC v. Commonwealth Financial Group, Inc.*, 874 F. Supp. 1345, 1354-55 (S.D. Fla. 1994); *Wasnick v. Refco, Inc.*, 911 F.2d 345, 348 (9th Cir. 1990); *Lawrence v. CFTC*, 759 F.2d 767, 773 (9th Cir. 1985); and *Hammond v. Smith Barney Harris Upham & Co.*, [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,617 at 36,659 (CFTC Mar. 1, 1990) (scienter is a necessary element of proof for a violation of § 4b(a) of the Act).

21. Defendant violated the Act's anti-fraud provision even though no one became a customer based upon fraudulent solicitations. *See In re GNP Commodities, Inc.*, [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 25,360 at 39218 (CFTC August 11, 1992) *aff'd in part and rev'd in part on other grounds sub nom., Monieson v. CFTC*, 996 F.2d 852 (7th Cir. 1993):

> Congress intended in Section 4b(A) and (C) of the Act to forbid attempts to deceive or to defraud. Requiring proof of reliance would be at odds with the plain language of the statute, for attempted frauds by definition do not involve a completed act, and therefore reliance cannot be an element of a charge of attempted fraud.

*See also aff'd sub nom. JCC, Inc. v. CFTC*, 63 F.3d 1557 (11th Cir. 1995) (in an enforcement proceeding under § 4b(a) of the Act, reliance by customers is irrelevant).

8

*M.I.Y.*

*Commonwealth Financial Group, Inc.*, 874 F. Supp. at 1350 (court found that a salesperson's failure to discuss risk when attempting to sell commodities options constitutes an "attempt to deceive" and, consequently, a violation of the Act and Regulations in contravention of the preliminary injunction). Thus, regardless of whether any individual did actually invest funds in the managed account program, a violation of Section 4b(a)(2) has occurred.

22. Defendant has violated Section 4b(a)(2) of the Act and Commission Regulation 1.1(b)(1) and (3) by representing that he managed forex accounts when he did not, and by representing a fictitious "trading record" that showed annual returns that ranged between 98.06% and 200%. Defendant also fraudulently "guaranteed" up to 200% annual profits to prospective customers of Defendant's purported managed forex accounts. Guarantees of profitability are inherently fraudulent because, given the uncertainties in the market, they misrepresent the likelihood of profiting from commodity futures and options transactions, as well as the substantial risks of investing in commodity futures and options. *Munnel v. Paine Webber*, Comm. Fut. L. Rep. (CCH) ¶ 23,313 (CFTC Oct. 8, 1986) (finding that investment advisor's statement that client could conservatively expect a return of 32% amounted to guarantee of profitability and that "[s]uch guarantees are inherently fraudulent."); *see also Commodity Futures Trading Commission v. Wall Street Underground*, 281 F.Supp.2d 1260, 1270 (2003) ("Likewise, promises and guarantees of profit, given the uncertainties of the marketplace, are inherently fraudulent.")

23. Defendant acted with scienter because he knowingly, or with a reckless disregard for the truth or falsity of such statements, incorporated into the website the misrepresentation of guaranteed profits of 200% in a twelve month period, among others. Similarly, Defendant made, or caused to be made, fraudulent misrepresentations to customers by presenting a fictitious

9

M.14

professional background for FX Unigma, fictitious addresses, and false statements with respect to the length of time in business were made on Defendant's two websites.

24. Each of these violations concerned facts that were material to FX Unigma's customers and prospective customers.

**2. Defendant Was Doing Business as FX Unigma, Inc. and FX World, Inc.**

25. At all relevant times, Defendant possessed control over the economic and website operations of FX Unigma and FX World. Defendant paid for the registration of the FX Unigma websites and opened bank accounts and web payment accounts to receive funds from prospective customers of FX World and FX Unigma. FX Unigma, Inc and FX World were not incorporated or registered to do business anywhere in the United States.

26. At all relevant times the FX World website either directed users to the FX Unigma website or under FX World solicited customers for FX Unigma using the exact same information found on the FX Unigma site and directing payment to Defendant in Bulgaria. E-mails to the FX World site are answered by FX Unigma. In sum, FX Unigma and FX World were alter egos for Defendant.

**3. Injunctive Relief**

27. The Commission's Complaint seeks entry of a permanent injunction against Defendant to prohibit him from future violations of the Act and granting other relief. Unless restrained and enjoined by this Court, the Defendant could continue to engage in acts and practices alleged in the Commission's Complaint, as well as similar acts and practices.

28. The Court finds the requested relief to be appropriate in this case because there is a reasonable likelihood that the wrong will be repeated. *CFTC v. Carnegie Trading Group, et al.*, 450 F. Supp. 2d 788, 806 (N.D. Ohio 2006). *See also SEC v. Carriba Air, Inc.*, 681 F.2d

*M-1.Y.*

1318, 1322 (11th Cir. 1982); *CFTC v. Rosenberg*, 85 F. Supp. 2d 424, 454 (D. N.J. 2000); *CFTC v. Morgan, Harris & Scott, Ltd.*, 484 F. Supp. 669, 677-679 (S.D. N.Y. 1979).

### IV. ORDER FOR PERMANENT INJUNCTION

Accordingly, **IT IS HEREBY ORDERED THAT**:

29. Defendant is permanently restrained, enjoined and prohibited from directly or indirectly:

   a) Soliciting, receiving, or accepting any funds from any person in connection with the purchase or sale of any commodity, as that term is defined in Section 1a(4) of the Act, 7 U.S.C. § 1a(4) ("commodity interest");

   b) Controlling or directing the trading of any commodity interest account for or on behalf of any person or entity, directly or indirectly, whether by power of attorney or otherwise;

   c) Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration, except as provided for in Commission Regulation § 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2006), or acting as a principal, agent, officer or employee of any person registered, exempted from registration or required to be registered with the Commission, unless such exemption is pursuant to Commission Regulation § 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2006);

   d) Trading on or subject to the rules of any registered entity, as that term is defined in § 1a(29) of the Act, 7 U.S.C. § 1a(29)(2002);

   e) Entering into any commodity interest transactions for his own personal account, for any account in which he has a direct or indirect interest and/or having any commodity interests traded on his behalf; and

   f) engaging in any business activities related to commodity interest trading.

30. Defendant, and any person insofar as he or she is acting in the capacity of officer, agent, servant, employer, and/or attorney of Defendant, and any person insofar as he or she is acting in active concert or participation with Defendant who receives actual notice of this Consent Order by personal service or otherwise, is permanently enjoined from directly or

11

*M.I.Y.*

indirectly violating § 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. § 6b(a)(2)(i) and (iii) (2002) and Commission Regulation 1.1(b)(1) and (3), 17 C.F.R. § 1.1(b)(1) and (3) (2005).

31. The injunctive provisions of this Consent Order shall be binding upon Defendant, upon any person insofar as he or she is acting in the capacity of officer, agent, servant or employee of Defendant, and upon any person who receives actual notice of this Consent Order, by personal service or otherwise, insofar as he or she is acting in active concert or participation with Defendant.

IT IS FURTHER ORDERED THAT:

### V. CIVIL MONETARY PENALTY

32. Good cause exists for the imposition of equitable remedies and civil monetary penalties ("CMP"), upon Defendant. Pursuant to 7 U.S.C. § 13a-1 and 17 C.F.R. § 43.8(a)(1)(i), this Court may impose, on a proper showing, an order directing the Defendant to pay a CMP.

33. A proper showing having been made, Defendant shall be assessed a CMP in the amount of $30,000.

### VI. PAYMENT OF CIVIL MONETARY PENALTY

34. Defendant shall, immediately upon entry of this Consent Order, pay to the Commission a civil monetary penalty of $30,000, plus post-judgment interest. Post-judgment interest shall accrue beginning on the date this Consent Order is entered and continue until the CMP is paid in full and will be determined by using the Treasury Bill rate prevailing on the date of entry of this Consent Order pursuant to 28 U.S.C. § 1961. Defendant shall pay his CMP and interest by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's check, or bank money order. If payment is to be made by other than electronic funds

*M.I.Y.*

Case 2:05-cv-00900-NMK   Document 41-2   Filed 04/30/2007   Page 13 of 15

transfer, the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

    Commodity Futures Trading Commission
    Division of Enforcement
    ATTN: Marie Bateman-AMZ-300
    DOT/FAA/MMAC
    6500 S. Macarthur Blvd.
    Oklahoma City, OK 73169

If the payment is to be made by electronic funds transfer, contact Marie Bateman at 405-954-6569 for instructions. Defendant shall accompany the payment of the CMP with a cover letter that identifies him and the name and docket number of this proceeding. Defendant shall simultaneously transmit a copy of the cover letter and the form of payment to Director, Division of Enforcement, Commodity Futures Trading Commission, 1155 21st Street, N.W., Washington, D.C. 20581.

## VII. MISCELLANEOUS PROVISIONS

35.    **ENTIRE AGREEMENT AND AMENDMENTS**: This Consent Order incorporates all of the terms and conditions of the settlement among the Parties hereto. Nothing shall serve to amend or modify this Consent Order in any respect whatsoever, unless: (1) reduced to writing; (2) signed by all Parties hereto; and (3) approved by order of this Court.

36.    **WAIVER**: The failure of any party hereto at any time or times to require performance of any provision hereof shall in no manner affect the right of such party at a later time to enforce the same or any other provision of this Consent Order. No waiver in one or more instances of the breach of any provision contained in this Consent Order shall be deemed to be or construed as a further or continuing waiver of such breach or waiver of the breach of any other provision of this Consent Order.

*M.I.Y.* (initials)

37. **SUCCESSORS AND ASSIGNS**: This Consent Order shall inure to the benefit of and be binding upon the Parties hereto and the successors, assigns, heirs, beneficiaries and administrators of the Parties hereto.

38. **ACKNOWLEDGEMENTS**: By signing this Consent Order, Defendant and his attorney acknowledge and attest that this agreement was fully translated and explained to Defendant and that this Consent Order is entered into with full knowledge of its contents and obligations.

39. Upon being served with copies of this Consent Order after entry by the Court, Defendant shall sign acknowledgements of such service and serve such acknowledgments on this Court and the Commission within seven (7) calendar days of being served with copies of this Consent Order.

40. **NOTICES**: All notices required by this Consent Order shall be sent by certified mail, return receipt requested, as follows:

| 1. Notice to Plaintiff Commission: | 2. Notice to Defendant: |
|---|---|
| Director, Division of Enforcement<br>Commodity Futures Trading Commission<br>1155 21st St., N.W.<br>Washington, DC 20581 | Glenn Cairns, Esq.<br>560 N. Moorpark Road<br>Ste PMB-230<br>Thousand Oaks, CA 91360 |

50. **INVALIDATION**: If any provision of this Consent Order, or the application of any provisions or circumstances is held invalid, the remainder of the Consent Order and the

14

*M.J.Y*

application of the provision to any other person or circumstance shall not be affected by the holding.

ENTERED THIS 1st of MAY, 2007.

_____
Norah McCann King
United States Magistrate Judge

Consented to and approved for entry by:

_____
Defendant Marin Illiev
Date: 06 April 2007

_____
Glenn Cairns, Esq.
Attorney for Defendant Marin Illiev Yanev
Date: April 11, 2007

_____
Peter M. Haas, Attorney for Plaintiff
Commodity Futures Trading Commission
Date: 4/30/07

15